UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CHRIS ALLEN BLOSSER,                    Case No. 07-14031

                    Plaintiff,          Thomas L. Ludington
                                         United States District Judge
vs.
                                        Michael Hluchaniuk
TODD GILBERT, *et al.*,                 United States Magistrate Judge

                    Defendants.
_____/

**REPORT AND RECOMMENDATION**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 79)**

**I.    PROCEDURAL HISTORY**

In this case, plaintiff seeks money damages for alleged constitutional

violations pursuant to 42 U.S.C. § 1983.[1]  (Dkt. 1).  Plaintiff claims that certain

defendants used excessive force during his arrest and caused him to suffer

significant injuries and that other defendants (who have since been dismissed)

failed to pursue timely and adequate medical care, causing him to suffer

permanent disfiguration and disability.  *Id.*

_____

[1] This Report and Recommendation contains hyperlinks to statutory and
case law references, for the ease of the parties and others viewing this document
electronically. This is not intended to be an endorsement of any product, service,
or company.

Based on a motion from plaintiff, discovery was extended until November 24, 2008. (Dkt. 61). 72). On January 23, 2009, defendants Gilbert and Carpentier filed a motion for summary judgment. Plaintiff filed a response on February 19, 2009. (Dkt. 82). Defendants filed a reply on March 2, 2009. (Dkt. 83). This matter is now ready for report and recommendation.

For the reasons set forth below, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **DENIED**.

## II.    STATEMENT OF FACTS

A.    <u>Complaint</u>

Plaintiff alleges that, during the course of an arrest, after his vehicle was pulled over, defendants Gilbert and Carpentier used excessive force in dragging him through his vehicle window, despite knowing that his legs were caught under the steering wheel. (Dkt. 1). Plaintiff alleges that defendants Gilbert and Carpentier continued to pull on plaintiff's arm until he heard a popping sound and then was "extracted" from his vehicle. (Dkt. 1). Plaintiff also alleges that defendants Gilbert and Carpentier "forcefully twisted" his injured arm behind his back and handcuffed him. (Dkt. 1). Plaintiff was transported to the emergency room at Hurley Medical Center and was diagnosed with a ruptured long head left biceps tendon. (Dkt. 1). Plaintiff was given a sling and pain medication. (Dkt. 1).

According to plaintiff, the emergency room physician told plaintiff that surgery

would be required right away to successfully reconnect the tendon to the bone.

Plaintiff was discharged with instructions to make an appointment in the

orthopedic clinic on January 5, 2006.  (Dkt. 1).  The emergency room physician

personally gave defendant Carpentier a copy of the discharge instructions.  (Dkt.

1).  Plaintiff alleges that it was objectively unreasonable for defendants Carpentier

and Gilbert to pull him from his vehicle in the manner they did and to handcuff

him knowing his arm was injured.

      B.    <u>Defendant's Position</u>

On December 27, 2005, at approximately 11:25 a.m., defendant Gilbert of

the Grand Blanc Township Police Department was dispatched by central dispatch

to the Grand Blanc Vet Hospital for an unlawful driving away of a motor vehicle

(UDAA) that just occurred.  (Dkt. 79, Ex. A - Gilbert Police Report, p. 4; Ex. B -

plaintiff's deposition, pp. 92-93).  Specifically, he was advised that the vehicle

taken from the lot was a 2005 GMC Sierra pick-up.  (Dkt. 79, Ex. A, p. 4).  While

defendant Gilbert had been advised that the owner of the pick-up truck had left it

running with the keys in the ignition, (*id*.), plaintiff testified that he found the keys

on the ground inside the veterinary clinic and took them with the intention of

stealing the Sierra.  (Dkt. 79, Ex. B, pp. 99, 101-103).  Defendant Gilbert was also

advised that the suspect in the UDAA arrived in a maroon Chevy S-10 pick-up truck (Dkt. 79, Ex. A, p. 4). Plaintiff confirmed that he drove the S-10 to the vet clinic, that the S-10 was registered to another individual, and that it had improper plates. (Dkt. 79, Ex. B, pp. 88-89, 91). Defendant Gilbert ran the license plate and determined that the license plate had expired in September 2005. *Id*. While interviewing the victim of the UDAA, defendant Gilbert was advised that the Sierra had been taken by a white male, later identified as plaintiff. *Id*. Witnesses confirmed that plaintiff had been inside the veterinary clinic and had urinated outside of the clinic. *Id*. Again, plaintiff confirmed this, testifying that he went to the veterinary clinic for purposes of using the restroom, but got sidetracked when he found the keys to the Sierra on the ground. (Dkt. 79, Ex. B, pp. 97, 99). After finding the keys, plaintiff attempted to take attention away from himself by asking the receptionist questions about shots for his dog. He then left the clinic, urinated in the parking lot, and located the Sierra by using the "clicker" located on the key chain. *Id*. at 97-101.

Plaintiff then "drove off in the truck." *Id*. at 101. When asked why he did this given the fact that he had another vehicle, plaintiff testified that he "figured [he] might be able to sell it or something" so that he could get money for drugs and to "live on." *Id*. After he drove approximately a "couple miles," he realized

that the vehicle was equipped with On-Star and that the police would be able to track him.  *Id*. at 103.  Accordingly, he abandoned the Sierra, but not before taking several items, including a digital camera and a CD case that was on the front seat. *Id*. at 103-104.  He then hitchhiked a ride back to veterinary clinic to get his S-10 pick-up.  *Id*. at 104.  Once he got back to the clinic, he acknowledged getting in the S-10 and driving away.  *Id*.

After driving away, plaintiff observed a police car operated by defendant Gilbert "pull[] up beside" him while he was driving "northbound on Saginaw Street."  *Id.* at 105; Ex. A, p. 5.  Before pulling next to plaintiff, defendant Gilbert, who was driving a fully marked and lighted vehicle, had activated his emergency lights and siren.  (Dkt. 79, Ex. A, p. 5; Ex. B, pp. 105-106, 109; Ex. C - Carpentier Police Report, p. 1; Ex. D - Whittey Police Report, p. 1).  Further, plaintiff conceded that after observing defendant Gilbert's car next to him (defendant Carpentier and nonparty Officer Whittey were in pursuit at this time as well (Ex. C - Carpentier Police Report, p. 1; Ex. D - Whittey Police Report, p. 1), he "knew he was in trouble" and that he knew defendant Gilbert wanted him to stop.  (Dkt. 79, Ex. B, p. 107).  Plaintiff continued driving, violating numerous traffic laws (including speeding, driving through stop signs and red lights, driving the wrong way down a one-way street) because he did not want to stop out of fear

of being arrested.  *Id*. at 107, 109-111, 116.

Plaintiff admitted that while fleeing, his S-10 eventually had contact with a paramedic Tahoe, and that despite this contact, he still refused to stop.  *Id*. at 111-113; Ex. A, p. 6.  Plaintiff also conceded that this collision occurred after the chase had been going on for "a few minutes."  (Dkt. 79, Ex. B, p. 112).  Following this first collision, plaintiff continued to drive on a flat tire and was eventually involved in another collision, this time with a State Police Crown Victoria.  *Id*. at 114; Ex. A, p. 6; Ex. E - Trooper Williams' Police Report, p. 1.  Plaintiff again refused to stop; rather he continued driving in an attempt to "turn onto the [1-69] expressway." *Id*. at 116.  While trying to enter the expressway, plaintiff again collided with the Crown Victoria, *id*. at 116-117, which caused him to "spin out and stall."  *Id*. at 117, 125; Ex. C, p. 1; Ex. E, p. 1.  He was immediately "boxed in" by other police cars.  *Id*. at 118.

Several officers, including defendants Gilbert and Carpentier, approached plaintiff's vehicle with guns drawn.  *Id.* at 133; Ex. A, p. 6; Ex. E.  Defendant Gilbert and non-party Trooper Williams "ordered [plaintiff] to put his hands up several times" and to "place his hands outside the vehicle several times" (Ex. A, p. 6; Ex. B, pp. 126-127, 130; Ex. E).  Plaintiff admits that he never made eye contact with the police before or after he started to put his hands up.  (Dkt. 79, Ex. B, p.

Report and Recommendation
Defendants' Motion for Summary Judgment
*Blosser v. Gilbert*; 07-14031

128).  He also admitted that he only looked straight ahead and then, looked down

at his lap.  (Dkt. 79, Ex. B, pp. 128-130; Ex. A, p. 6).  Plaintiff also admitted that

while he started to raise his hands up, he never put his hands higher than head

level.  (Ex. B, p. 127).

After looking down into his lap, plaintiff claims he received a command to

get out of the car from defendant Carpentier.  (Dkt. 79, Ex. B, pp. 131 - 133).  At

that point, plaintiff admits that he put his left hand down and started to reach

toward the window jamb.  (Dkt. 79, Ex. B, p. 133).  Not knowing what plaintiff

intended to do and not knowing what plaintiff may have had in his lap, defendant

Gilbert grabbed plaintiff's left arm and "ordered him to get out of the window."

(Dkt. 79, Ex. B, p. 134; Ex. A, p. 7; Ex. D, p. 2).  Because plaintiff did not follow

the command to get out through the window, defendant Gilbert, with defendant

Carpentier's assistance, pulled plaintiff out of the car through the window.  (Dkt.

79, Ex. B, p. 137; Ex. A, p. 7; Ex. C, 1; Ex. D, p. 2; Ex. E, p. 1).  While plaintiff

denies resisting defendants' attempt to get him out of the S-10, he admits that his

legs became "pinned" under the steering wheel and that because of the resistance

caused by this, defendants could have thought he was resisting their efforts to get

him out of the truck.  (Ex. B, pp. 137-139).  Plaintiff was eventually lifted through

the window of the truck, and without touching the ground he was taken over and

placed onto a nearby police vehicle hood. *Id*. at 139-140.

Consistent with police training, defendant Gilbert says that he performed "a wrist lock and did a straight arm bar" take down ... to the ground" where plaintiff was handcuffed. (Dkt. 79, Ex. A, p. 7; Ex. B, pp. 141- 143; Ex. C, p. 1). Plaintiff also testified that, while on the ground, a knee was placed on his back, but he does not know who allegedly put this knee in his back, as he was face down on the ground. (Dkt. 79, Ex. B, p. 143). Plaintiff claims that with the exception of an "insignificant" scrape on his face, the only pain he suffered as a result of being taken to the ground was pain to his arm, which he attributed "to the way they pulled [him] out of the vehicle" (Dkt. 79, Ex. B, pp. 143-144).

From there, plaintiff testified he was placed in a police vehicle. *Id.* at 145. He told the officers that his left arm hurt. *Id.* at 150. As a result, defendants called for an ambulance service, and the ambulance service eventually came to examine him while he was seated in the back of the car. *Id.* at 151. He was then transported to Hurley Hospital, where he was treated and released for a torn biceps muscle in his left arm. He testified that he was advised by the doctor at the hospital that he should have a follow-up appointment within a week at the orthopedic clinic. *Id.* at 180-181. A copy of this instruction sheet was given to defendant Carpentier. Plaintiff was then transported to the Grand Blanc Township

Police Department for booking and to the Genesee County Jail for lodging.  The instruction sheet was provided to the jail clinic staff.  *Id*. at 181-182.

Defendants argue that this case is substantially similar to the recently decided case of *Dunn v. Matatall*, 549 F.3d 348 (6th Cir. 2008).  In *Dunn*, the defendant officers pulled the plaintiff out of the car following a two minute chase where the plaintiff had committed several traffic offenses.  Further, the plaintiff drove through residential neighborhoods, violating numerous traffic laws.  The Sixth Circuit concluded that, based on these circumstances, it was clear that an objectively reasonable police officer could have concluded that it was necessary to grab the plaintiff to get him out of the vehicle.  Defendants assert that this case is, if not on all fours, substantially similar to *Dunn* and that based on the circumstances of this case, it is clear as a matter of law that defendants did not violate plaintiffs constitutional rights.  Simply put, based on plaintiff's repeated failures to stop, despite knowledge that defendants wanted him to stop, as well as plaintiff's failure to immediately put his hands up or get out of the car after the truck eventually came to a stop (which, unlike in *Dunn*, was not voluntarily stopped by plaintiff), and plaintiff looking into his lap instead of at defendants, it was objectively reasonable for defendants to grab plaintiff by the arm in an effort to get him out of the S-10 and to use a straight arm take down to handcuff him.

Defendants argue that, at the time, they made the split-second decision to grab plaintiff, who had been looking down at his lap and started to move his arm and hand out of the view of defendants, "the law ... did not clearly establish" that their actions under these circumstances violated the constitution. This is especially true, according to defendants, given the recent holding in *Dunn*. Indeed, the undisputed facts establish that defendants were aware that plaintiff had led them on a chase through several residential areas, violated numerous traffic laws (including driving the wrong way on a one-way street, running stop signs and a red light, and continuing to drive after at least two collisions with police vehicles) and did not stop until his vehicle stalled out while he was attempting to get on the expressway. Plaintiff then refused to acknowledge defendants and looked down at his lap before lowering his hand in that general vicinity. Based on these facts, any objectively reasonable police officer could have concluded that it was imperative for plaintiff to be removed from his vehicle as soon as possible. Thus, according to defendants, they had to act quickly, without delay, in order to eliminate any potential threat. Viewed from this perspective, grabbing plaintiff's arm, removing him from his vehicle through the window, and handcuffing him behind his back were objectively reasonable actions.

C.   Plaintiff's Position

Plaintiff argues that there are significant material questions of fact that preclude summary judgment.  (Dkt. 82).  He also argues that his deposition testimony is not admissible because he was not allowed to cross-examine himself. Plaintiff's primary factual disputes begin at the point where his vehicle was stopped at the conclusion of the pursuit.  According to plaintiff, several officers, including defendants Gilbert and Carpentier, approached his vehicle with guns drawn.  Defendant Gilbert ordered plaintiff to put his hands up.  Plaintiff continued to look forward and cautiously raised his hands so there would be no sudden movement and no reason for the officers to use any force.  He raised his hands as high as they would go, to the roof of the S-10.  Plaintiff says he was not given any order to look at the officers and he immediately followed the command to raise his hands.  Plaintiff asserts that defendant Gilbert's account that he and Trooper Williams ordered him to place his hands up several times and to place his hands outside the vehicle is contrary to Trooper Williams' report that plaintiff was ordered to show his hands.  (Dkt. 82, p. 3, citing, Dkt. 79, Ex. E., p. 1).

As plaintiff sat with his hands up, defendant Carpentier ordered plaintiff to "exit the truck."  (Dkt. 82, pp. 3-4).  While plaintiff was trying to comply with this command by lowering his hand to reach for door handle, defendant Gilbert lunged

and grabbed his left hand and arm and began to pull him from the truck through the window.  (Dkt. 82, p. 4).  Plaintiff says that he did not move his hand towards his lap or out of view and does not recall looking down towards his lap.  (Dkt. 82, p. 4).  To support his claim of conflicting commands, plaintiff points to the sworn interrogatory answer of defendant Carpentier that he ordered plaintiff to exit his truck and that plaintiff lowered his left arm in response to that command.  (Dkt. 82, p. 5; Ex. B, ¶¶ 11, 12).  Plaintiff also points out that defendant Gilbert's incident report does not reflect his claim that "Plaintiff's left arm was grabbed when it went out of view."  Rather, his incident report says that he "noticed the suspect starting to place his hands back down to his lap so [Gilbert] lunged and grabbed his left hand and arm."  (Dkt. 82, p. 4, citing, Ex. C. ¶ 13).

Defendant Carpentier then grabbed plaintiff's arm and began to help defendant Gilbert pull him through the window.  As defendants exerted force on plaintiff's arms, his body raised from the seat and they could see that his thighs were coming into contact with the bottom of the steering wheel.  As defendants exerted more force, plaintiff grunted loudly with pain, they pulled harder, a popping sound was heard, and plaintiff went limp.  According to plaintiff, although defendants realized that they had seriously injured plaintiff, they continued pulling his arm until they extracted him from the truck.  (Dkt. 82, p. 5).

Plaintiff denies testifying that they officers could have though he was resisting their efforts to get him out of the truck as a result of his legs being caught under the steering wheel. (Dkt. 82, p. 5). Plaintiff also points out that defendants, in their sworn interrogatory answers, stated that his legs were not caught under the steering wheel and his legs were not pinned in any fashion. (Dkt. 82, p. 5; Ex. B, ¶¶ 14-16).

After plaintiff was pulled through the window, defendants slammed him onto the hood of a police cruiser and to the ground, face first. Plaintiff says that although defendants knew his arm was injured, they forcefully twisted his injured arm behind his band and handcuffed him behind his back. They then pulled plaintiff upright by the chain between the handcuffs and shoved him into the backseat of a patrol car. (Dkt. 82, p. 5). Plaintiff was transported to the hospital shortly thereafter, although the parties dispute whether he was transported by ambulance or police cruiser.

D.    Defendants' Reply

Defendants argue that plaintiff's affidavit should be stricken because it conflicts with his deposition testimony. (Dkt. 83). Specifically, with regard to plaintiff's actions in the vehicle after it had stalled, plaintiff testified that, while he raised his hands in response to defendant Gilbert's order, he never: (1) looked at

the officers; (2) continued to look straight ahead; (3) did not dispute that he looked

down at his lap; and (4) moved his left arm toward the door handle after he looked

down at his lap.  (Dkt. 83, citing Ex. B, pp. 127-134).  Defendants point out that,

while he testified that he "very cautiously raised [his] hands" there was no such

testimony regarding how he lowered his hands.  *Id*. at 127, 133.  Rather, he simply

testified that he reached for the door handle after he had looked down in his lap.

*Id*. at 130, 133.  According to defendants, plaintiff has embellished this testimony

in his affidavit in an effort to create a sham issue of fact.

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the

discovery and disclosure materials on file, and any affidavits show that there is no

genuine issue as to any material fact and that the movant is entitled to judgment as

a matter of law."  Fed.R.Civ.P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476, 478-

79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary

judgment:

> The moving party bears the initial burden of establishing
> an absence of evidence to support the nonmoving party's
> case.  Once the moving party has met its burden of
> production, the non-moving party cannot rest on its
> pleadings, but must present significant probative

Report and Recommendation
Defendants' Motion for Summary Judgment
*Blosser v. Gilbert*; 07-14031

> evidence in support of the complaint to defeat the motion
> for summary judgment.  The mere existence of a scintilla
> of evidence to support plaintiff's position will be
> insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-moving party's evidence and construing all inferences from that evidence in the light most favorable to the non-moving party, there is sufficient evidence for a trier of fact to find for the non-moving party.  *Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  This is not to say that some credibility determinations are beyond what is appropriate in deciding a motion for summary judgment.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

Rule 56 limits the materials the Court may consider in deciding a motion under the rule:  "pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995) (citation omitted). Moreover, affidavits must meet certain requirements:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed.R.Civ.P. 56(e)(1). In accordance with Rule 56(e), the Sixth Circuit has held "that documents submitted in support of a motion for summary judgment must satisfy the requirements of Rule 56(e); otherwise, they must be disregarded." *Moore v. Holbrook,* 2 F.3d 697, 699 (6th Cir. 1993). Thus, in resolving a Rule 56 motion, the Court should not consider unsworn or uncertified documents, *Id.*, unsworn statements, *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-969 (6th Cir. 1991), inadmissible expert testimony, *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1280 (6th Cir. 1997), or hearsay evidence, *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996); *Wiley v. United States*, 20 F.3d 222, 225-226 (6th Cir. 1994). *See Tolliver v. Federal Republic of Nigeria*, 265 F.Supp.2d 873, 879 (W.D. Mich. 2003), or uncertified and unsworn police reports.

*Fox v. Michigan State Police Dep't*, 173 Fed.Appx. 372, 2006 WL 456008 (6th Cir. 2006) ("[P]olice reports, which were neither sworn nor certified, were not properly authenticated and were therefore inadmissible in evidence.").[2]  Thus, "[a] party opposing a motion for summary judgment cannot use hearsay or other inadmissible evidence to create a genuine issue of material fact." *Id.*, quoting, *Sperle v. Michigan Dept. of Corrections*, 297 F.3d 483, 495 (6th Cir. 2002) (citation and quotation marks omitted).

B.    Excessive Force Under the Fourth Amendment

"[C]laims that law enforcement officers have used excessive force-deadly or not-in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989).  In determining whether a constitutional violation based on excessive force has occurred, the Sixth Circuit applies "the objective-reasonableness standard, which depends on the facts and circumstances of each case viewed from the perspective of a reasonable officer on the scene and not with 20/20 hindsight." *Fox v. DeSoto*, 489 F.3d 227, 236 (6th

_____

[2]  In this case, defendants offer several police reports that are neither sworn nor certified.  (Dkt. 79, Exs. A, C-E).  Thus, they are not admissible to support defendants' motion.  However, to the extent that plaintiff uses them to impeach defendants' version of the facts, the undersigned may rely on them.

Cir. 2007), citing, *Graham*, 490 U.S. at 395-96. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving-about the amount of force that is necessary in a particular situation."

*Graham*, 490 U.S. at 396-97. "Relevant considerations include 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Fox*, 489 F.3d at 236, quoting, *Graham*, 490 U.S. at 396.

In the view of the undersigned, defendant Gilbert's decision to grab plaintiff's hand when it went out of view, based on the belief that he could be reaching for a weapon, was objectively reasonable. (Dkt. 82, Ex. B, Interrogatory Answer No. 12). Defendant Gilbert did not give plaintiff the command to exit the vehicle; rather, that command was given by defendant Carpentier. (Dkt. 82, Ex. B, Interrogatory Answer No. 11). The conflicting commands given to plaintiff by two different officers does not render defendant Gilbert's initial decision to grab plaintiff's hand when it went out of view, objectively unreasonable. As to this aspect of plaintiff's claim and defendants' actions, the undersigned suggests that this matter is quite similar to the case of *Dunn v. Matatall*, 549 F.3d 348, 354 (6th Cir. 2008), in which the Sixth Circuit concluded that a reasonable officer would

not have believed that the threat posed by a suspect fleeing in an automobile, who violated several traffic laws while evading the police, "was not contained until [the plaintiff] was out of the car and handcuffed."

Bearing in mind that the Courts cannot make any credibility determinations on a motion for summary judgment and must take the evidence in light most favorable to the plaintiff, the undersigned suggests that there are material questions of fact as to whether pulling plaintiff from the S-10 by one arm through the truck window was excessive force. *See e.g.*, *Atkins v. Township of Flint*, 94 Fed.Appx. 342 (6th Cir. 2004), citing, *Bass v. Robinson*, 167 F.3d 1041 (6th Cir. 1999) (reversing the district court's grant of summary judgment on defendant police officer's qualified immunity defense where the plaintiff's verison of the material events differed from the defendant's version and where the plaintiff's version, if accepted, supported a claim for excessive force).

Defendants assert, again, that this case is on all fours with *Dunn v. Matatall* and that the force used was not excessive under the circumstances.  While there are many similarities between Dunn and the present case, there is one important distinguishing fact.  In *Dunn*, when the officer approached the suspect in the vehicle following a high-speed chase, he instructed the suspect to unlock the door. The officer grabbed one of the suspects hands through the open window, opened

the door, and then attempted to remove the suspect from the automobile. *Dunn,*

*549 F.3d at 351*.  There was some struggle to remove the suspect from his vehicle,

due apparently to his seatbelt being fastened.  *After* the suspect was actually

removed from the car through the opened door, one of the officers lost his grip on

the suspect, the suspect apparently twisted or spun slightly while the other officer

maintained his grip on the suspect.  The suspect then fell on the ground, sustaining

a broken hip.  *Id.*  The *Dunn* court concluded that "given the heightened suspicion

and danger brought about by the car chase and the fact that an officer could not

know what other dangers may have been in the car, forcibly removing Dunn from

the car to contain those potential threats was objectively reasonable."  *Dunn*, 549

F.3d at 355.

In the present case, defendants do not explain why they did not open the

door of the S-10 or otherwise explain why it was necessary to extract plaintiff

from the vehicle through the window.  Admittedly the conduct of officers is to be

viewed with a degree of deference because they "'have to make split-second

judgments - in circumstances that are tense, uncertain, and rapidly evolving'" but a

court must be able to determine the conduct in question is objectively reasonable

before summary judgment can be granted.  *Id. at 353*.  Pulling an adult human

being through the relatively small window of a compact pick-up truck, on this

record, cannot be viewed as objectively reasonable.  "[T]he use of an inherently

hazardous type of force, one that any reasonable person would know is likely to

cause serious injury ... , without any justification for doing so" violates the

constitution.  *Grawey v. Drury*, 567 F.3d 302, 315 (6th Cir. 2009).  Forcibly

pulling the plaintiff through the window of the driver's door of his S-10 pick-up is

an "inherently hazardous type of force" that a reasonable person would know is

"likely" to cause serious injury.   Defendants offer no evidence to suggest that

plaintiff resisted after his left hand was grabbed, or that the officers needed to pull

him through the window in order to maintain control of plaintiff.  Defendants offer

no evidence that plaintiff could not have been removed from the vehicle in a more

traditional manner, such as by opening the door, or that plaintiff was given a

reasonable opportunity to comply with the commands to somehow exit the truck.

Defendants offer no evidence suggesting that extracting plaintiff (who weighed

about 200 pounds at the time)[3] through the truck window was considered proper

pursuant police training or procedure.  The undersigned does not suggest that

removing a suspect from a vehicle through a window is somehow always

objectively unreasonable, but in this case, with the complete lack of evidence

---

[3]  *See* plaintiff's deposition transcript.  (Dkt. 79, Ex. B, p. 41)

offered by defendants to suggest that the chosen course of action was objectively reasonable under the circumstances, the undersigned can only conclude that a question of fact remains.

Defendants' efforts to discredit plaintiff's version of the facts merely illustrate the credibility contest presented by defendants' motion. For example, defendants argue that plaintiff's affidavit is contrary to his deposition testimony because plaintiff never testified regarding "how he lowered his hands." If there is no deposition testimony on this issue, then the undersigned fails to see how plaintiff's affidavit is inconsistent with his deposition testimony. Defendants also make much of plaintiff's admission that he never raised his hands above "head level" and that somehow, this was contrary to the commands given to plaintiff. (Dkt. 79, Ex. B., p. 127). Plaintiff also testified, however, that he raised his hands as high as the roof of his truck would allow, his fingertips were touching the roof of the truck, and this was essentially "head level." (Dkt. 79, Ex. B, pp. 127-128). Defendants' attorney even acknowledged during the deposition that there was not much head room height in an S-10 pickup truck. *Id*. Defendants also rely on the fact that plaintiff did not look at them while they were giving him commands. However, defendants offer no evidence, and none appears in their reports or answers to interrogatories, that plaintiff was given a command to "look at them."

Based on the credibility disputes before the Court, the undersigned suggests that summary judgment is not appropriate.

Plaintiff also claims that handcuffing him behind his back, knowing that he had suffered an arm injury, constituted excessive force.  Plaintiff claims that the "popping" noise that occurred when his arm was injured was audible and that defendants "knew" that his arm was injured after they pulled him through the truck window, based on the noise and that he went "limp" after this injury.  Defendants simply offer no evidence on this issue.  According to their answers to interrogatories, they "do not concede that Mr. Blosser's arm was injured prior to cuffing him, as this is a medical determination which we are unable to make as police officers."  (Dkt. 82, Ex. B, Interrogatory Answer No. 4).  The Sixth Circuit has held that allegations of injuries stemming from handcuffs is subject to an excessive force analysis.  *See Kostrzewa v. City of Troy*, 247 F.3d 633, 638-42 (6th Cir. 2001).  Handcuffing behind a suspect's back, in the face of obvious injuries that would make such handcuffing painful, can constitute excessive force. *See e.g.*, *Dixon v. Donald*, 291 Fed.Appx. 759 (6th Cir. 2008).  In light of the lack of evidence submitted by defendants as to their knowledge of plaintiff's injury, whether it was obvious, or whether an objectively reasonable officer would have discerned the injury and determined that handcuffing behind plaintiff's back was

not appropriate, the undersigned can only conclude that a question of fact remains.

C.     Qualified Immunity

Defendants claim to be entitled to qualified immunity regarding their actions in this case.  The doctrine of qualified immunity means that "'[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Caldwell v. Moore*, 968 F.2d 595, 599 (6th Cir. 1992), quoting, *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Defendants bear the burden of pleading qualified immunity, but plaintiff bears the burden of showing defendants are not entitled to qualified immunity.  *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002).

The Supreme Court had established a two-part test in order to determine whether a qualified immunity was applicable to a particular situation.  *Saucier v. Katz*, 533 U.S. 194 (2001).  The first part of the test involved a determination of whether the facts of the case, viewed in the light most favorable to the plaintiff, "show the officer's conduct violated a constitutional right."  *Id*. at 201.  If the first question was resolved in the affirmative then the court would decide "whether the right was clearly established."  *Id*.  If both questions are resolved in the

Report and Recommendation
Defendants' Motion for Summary Judgment
*Blosser v. Gilbert*; 07-14031

affirmative, then the doctrine of qualified immunity does not apply and the case can proceed.

The Supreme Court has revisited their decision in *Saucier* and concluded that the mandatory order of the two-part test for determining if qualified immunity applied was no longer sound based on several factors including judicial economy. *Pearson v. Callahan*, — U.S. —, 129 S.Ct. 808 (2009). While not modifying the factors that should be considered in such a decision, the Court held that sometimes it makes sense to allow the second part of the test to be decided first and that such a decision may resolve the controversy without having to address the first part of the test. In *Pearson*, the § 1983 claim of the plaintiff was based on an allegedly unlawful search conducted by the defendant police officers. Without having to engage in the perhaps more complicated decision of determining whether plaintiff's constitutional rights had been violated, the Court found that the constitutional right claimed by plaintiff was not clearly established where lower court case law was consistent with the conduct of the officers and "principles of qualified immunity [should] shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law."

As recently noted by this Court, the Sixth Circuit has consistently held that "[w]here the reasonableness of an officer's actions hinge on disputed issues of

fact, the jury becomes the final arbiter of ... immunity, since the legal question of immunity is completely dependent upon which view of the facts is accepted by the jury." *Mitchell v. County of Washtenaw*, 2009 WL 909581, *4 (E.D. Mich. 2009), quoting, *Leonard v. Robinson*, 477 F.3d 347, 354, 355 (6th Cir. 2007) (internal quotation marks and citation omitted).  Because questions of fact exist as to whether plaintiff's Fourth Amendment rights were violated, defendants do not satisfy the first prong of the *Saucier* test.  Thus, "[w]here ... the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability, and thus summary judgment should not be granted." *Mitchell*, at *4, quoting, *Griffith v. Coburn*, 473 F.3d 650, 656-657 (6th Cir. 2007) (internal quotation marks and citation omitted).  Based on the foregoing, the undersigned suggests that defendants' motion for summary judgment should be denied.

## IV.   RECOMMENDATION

For the foregoing reasons, the undersigned **RECOMMENDS** that defendants' motion for summary judgment be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 10 days of service, as provided for in 28 U.S.C. § 636(b)(1) and Local Rule 72.1(d)(2).  Failure to file

specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc.  Any objection must recite precisely the provision of this Report and Recommendation to which it pertains.  Not later than 10 days after service of an objection, the opposing party must file a concise response proportionate to the objections in length and complexity.  The response must address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc.  If the Court determines any objections are without merit, it may rule without awaiting the response to the objections.

Date: August 21, 2009

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

## <u>CERTIFICATE OF SERVICE</u>

    I certify that on <u>August 21, 2009,</u> I electronically filed the foregoing pleading with the Clerk of the Court using the ECF system which will send electronic notification to the following: <u>Boyd E. Chapin, Jr. and G. Gus Morris</u> and I certify that I have mailed by United States Postal Service the pleading to the following non-ECF participant: <u>Chris Blosser, # 182437, Mound Correctional Facility, 17601 Mound Rd., Detroit, MI 48212</u>.

s/James P. Peltier
Courtroom Deputy Clerk
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7850
pete_peltier@mied.uscourts.gov

Report and Recommendation
Defendants' Motion for Summary Judgment
*Blosser v. Gilbert*; 07-14031